UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MAMNOON AHMAD KHAN, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 12-cv-12333-IT |
| ONEBEACON INSURANCE COMPANY, | * | |
| CHARLES KRETSCHMAR, and JAMES | * | |
| MCKENNA, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM & ORDER

March 31, 2015

TALWANI, D.J.

I.    Introduction

Plaintiff Mamnoon Khan filed the instant action against his former employer, Defendant OneBeacon Insurance Company, and individual Defendants Charles Kretschmar and James McKenna, alleging state and federal law claims of retaliation and discrimination based on race, religion, and national origin as well as interference with statutory rights under state law.  In Defendants' Motion for Partial Summary Judgment [#91], Defendants seek dismissal of (1) the Complaint in its entirety against Kretschmar, (2) the discrimination claims against OneBeacon as they pertain to Kretschmar's comments and the allegations that Khan was denied the right to obtain certain state insurance licenses and experienced a delay in receiving a laptop computer, and (3) the retaliation claims.  As further explained below, the court finds that genuine disputes of material fact exist that preclude the entry of summary judgment.

II.    Discussion

Local Rule 56.1 requires that motions for summary judgment "include a concise
statement of the material facts of record as to which the moving party contends there is no
genuine issue to be tried  . . . ."  Defendants' Local Rule 56.1 statement is not concise.  Instead, it
identifies 312 facts that Defendants contend are both material to the claims at issue in the motion
and undisputed.  After Plaintiff Khan came forward with evidence disputing some of these facts
(and adding many facts of his own), Defendants responded that many of these facts—including
facts originally identified as material by Defendants—are not material.[1]  As a consequence of the
parties' voluminous statements, the burden of organizing the evidence in this case has been
"improperly shift[ed] . . . to the district court,"  Mariani-Colón v. Dep't Homeland Sec., 511 F.3d
216, 219 (1st Cir. 2007), and the purpose behind Rule 56.1 has been defeated.

Looking past this procedural deficiency and after review of the record, the court also
finds that the record supports Khan's position that he has properly disputed Defendants' material
facts so as to allow all claims to proceed to a jury.

        A.    Claims against Kretschmar

The Complaint asserts claims under state and federal law against Kretschmar individually
based on comments he purportedly made.  Defendants argue that Kretschmar made only two
comments, and that these comments were not severe or pervasive enough to be actionable.

---

[1] For example, Defendants asserted that James McKenna (identified by Defendants as Khan's
direct manager) "never had any conversations with Khan about his religion and did not know he
was Muslim."  Defs.' Statement Mat. Facts ¶ 23 [#93] ("Defs.' Statement").  When Khan came
forward with evidence from which a jury could find that McKenna did comment on Khan's
religion, see Pl.'s Resps. Defs.' Statement Undisputed Mat. Facts & Pl.'s Statement Add. Mat.
Facts ¶ 23 [#107] ("Pl.'s Response"), citing inter alia, id. ¶¶ 359-62, 367-68, 371, 409-414,
Defendants responded that these facts concerning McKenna's purported statements on Khan's
religion "do not constitute 'material' facts since Defendants did not move for summary judgment
on the claims against McKenna," Defs.' Resps. Pl.'s Statement Add. Mat. Facts ¶¶ 359-60, 368
[#119] ("Defs.' Response").

Defendants concede that in April 2010, Kretschmar introduced Kahn at a regional claim operations meeting stating, "This is Mamnoon Khan. He is recently back from Pakistan. Some of you may recall him from the Foxborough office. He worked there before. He recently has come back, but don't worry, he's not a terrorist. I haven't seen his picture in the paper." Defs.' Statement ¶ 28. Defendants contend that this statement "was a mere offensive utterance that did not alter Khan's work environment." Defs.' Mem. Law Supp. Mot. Partial Summ. J. at 7 [#92] ("Defs.' Mem."). They stress that Kretschmar was nervous when he made the statement, and that he was thinking of something to say when he introduced Kahn. Id. They point out that other employees were not upset by the comment, and that most of the people chuckled or laughed at Kretschmar's remark. Id. They discount Khan's contention that Kretschmar added "so he's ok" or "yet," Pl.'s Response ¶ 28, because Khan did not include those words in reports he made six months later. Defs.' Mem. at 6. They contend further that Kretschmar subsequently referred to Khan as "Dipanker"—the name of a OneBeacon employee of Indian descent—on one occasion and that this occurred "by accident." Id. at 11.

"[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993). Here, Defendants would have the court ignore even the undisputed circumstances relating to the first comment: that it was made when introducing Khan to a large group of co-workers, that Khan's co-workers responded with laughter, and that management, though present, expressed no disapproval whatsoever of what Defendants now concede was offensive.

The court need not, however, answer the question whether these circumstances are sufficient for a jury to find that Kahn was subjected to severe harassment that materially altered the conditions of his employment for the court must not just consider the facts that Defendants concede, but also the record and reasonable inferences in the light most favorable to the non-moving party.  Kahn has asserted that after the comment was made, other employees spat at the floor as he walked by and one employee stated "[t]here goes the terrorist," Pl.'s Response ¶ 350.  He testified that Kretschmar called him "Dipanker" repeatedly, and that when Kahn corrected Kretschmar, Kretschmar would wave Khan off with his hand in a mocking or nonchalant way.  Pl.'s Ex. 10, Khan Dep. at 89:22-90:20; Khan Aff. at ¶ 7.  Finally, Khan's physical work space was proximate to Kretschmar's, and Khan alleges that on multiple occasions, he overheard Kretschmar make several highly offensive comments to Khan's direct supervisor, Defendant McKenna.  One comment that Khan allegedly overheard was Kretschmar stating:  "Why don't we bomb that f-cking country and eliminate all the terrorists.  I hope my neighbor is visiting at that time."  Pl.'s Ex. 10, Khan Dep. at 95:4-7.  On this record, a jury could find that Kretschmar created a hostile or abusive work environment.

> B.    *Dismissal of the discrimination claims as they pertain to Kretschmar's comments and the allegations concerning the delayed receipt of state insurance licenses and a laptop computer*

Defendants' motion also seeks to dismiss certain allegations as they pertain to the discrimination claims against all Defendants.

First, Defendants argue that they cannot be responsible for Kretschmar's comments because Kretschmar was a co-worker, not a supervisor, and OneBeacon took prompt remedial action after Kahn complained about the statements.  The record shows that in April 2010, Ann Bender, the head of the Canton, Massachusetts office, was handing off some of her responsibilities to Kretschmar, who was transitioning to become head of the Canton office while

Bender was transitioning to become head of the Denver, Colorado office. Bender testified that she spent most of 2010 in Denver, but "would be back and forth because [she] still had responsibility for that office in Canton," which is why Kretschmar "was being made the assistant manager." Pl.'s Ex. 3, Bender Dep. at 33:11-22. Moreover, Khan testified that, although Kretschmar was not in his reporting line, "he was the next man in charge of the office." Pl.'s Ex. 10, Khan Dep. at 93:5-12. Defendants admit that OneBeacon's corporate structure at the time was shifting and consisted of both direct and dotted-line reporting structures. In any event, there is no dispute that Kahn's managers were present when the offensive statement was made and took no remedial action at that time.

Based on the above, a jury could find that Kretschmar was Khan's supervisor, see Vance v. Ball State Univ., 133 S. Ct. 2434, 2439 (2013), and hold the company strictly liable for supervisory harassment based on Kretschmar's comments under Mass. Gen. Laws. ch. 151B. See Noviello v. City of Boston, 398 F.3d 76, 95 (1st Cir. 2005) ("Unlike Title VII, however, chapter 151B does not afford employers any affirmative defenses to liability."). Under federal law, a jury could hold the company liable upon finding that Kretschmar's supervisors were aware of the offensive statement and failed to take appropriate remedial action at that time. See White v. N.H. Dep't of Corrections, 221 F.3d 254, 261 (1st Cir. 2000) ("If the harassment is caused by a co-employee, the employer is liable if it knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action.") (quotation marks and citation omitted).

Defendants also seek dismissal of the claims as they pertain to the allegations that Khan was denied the right to obtain certain state insurance licenses and experienced a delay in receiving a laptop computer. Defendants, however, may not carve up Kahn's claims and

preclude the introduction of facts that, standing alone, may not constitute an actionable claim. As the Supreme Court explained in Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002), "[h]ostile environment claims are different in kind from discrete acts" as they "are based on the cumulative effect of individual acts." Khan, therefore, may introduce relevant evidence to demonstrate that McKenna's alleged delay of Khan's receipt of certain state licenses and a laptop computer was part of a hostile work environment.

C.     *Retaliation claims*

Defendants' arguments that Khan's retaliation claims must be dismissed on summary judgment also fail because of the existence of disputed material facts. Khan's state and federal law retaliation claims are governed by the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), under which a plaintiff must first establish a prima facie case of retaliation by showing that "(1) she engaged in protected activity; (2) she suffered some materially adverse action; and (3) the adverse action was causally linked to her protected activity," Dixon v. Int'l Bd. of Police Officers, 504 F.3d 73, 81 (1st Cir. 2007). If the plaintiff makes this prima facie showing, the employer then must articulate a "legitimate, non-retaliatory reason for its employment decisions." Alvarado v. Donahoe, 687 F.3d 453, 458 (1st Cir. 2012) (quotation marks and citation omitted). If the employer meets this burden, the plaintiff has the burden of proof of showing that the "employer's stated reasons are pretextual and proffered to disguise retaliatory animus." Id. See Mole v. Univ. of Mass., 814 N.E.2d 329, 338 (Mass. 2004).

Under federal law, in the context of retaliation, adverse employment actions are those that, viewed objectively, might dissuade a worker from making or supporting a charge of discrimination. Burlington N. & Santa Fe Railway Co. v. White, 548 U.S. 53, 68 (2006). Under

the retaliation provisions of the Massachusetts employment discrimination statute, "no 'person, employer, [or] labor organization' may 'discharge, expel or otherwise discriminate against any person . . . because [she] has filed a complaint, testified or assisted in any proceeding' covered by the statute" and "[f]urther, no 'person [may] coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected' by the antidiscrimination statute." <u>Dixon</u>, 504 F.3d at 81 (quoting Mass. Gen. Laws ch. 151B, § 4(4)-4(4A)).

Here, it is undisputed that Khan engaged in protected conduct by, for instance, informing Human Resources of the alleged discriminatory comments made by Kretschmar and McKenna and by filing a charge with the Massachusetts Commission Against Discrimination (MCAD) in July 2011. In addition, Khan may also have engaged in protected conduct when he complained directly to McKenna. Accordingly, the issue before the court on summary judgment is whether a jury could find that Khan suffered an adverse action and that such action was a consequence of his protected conduct.

Khan alleges a number of adverse actions, including OneBeacon's failure to hire him for three different positions. The court finds several material facts in dispute such that a jury could find at least as to this claim that OneBeacon's stated reasons for its actions were pretextual.[2]

First, a reasonable dispute exists concerning Ann Bender's role in hiring for the open 2011 positions. The record contains sufficient facts for a jury to find that Bender had ultimate decisionmaking authority over hiring for these positions, <u>see</u> Pl.'s Ex. 53, Lamble Dep. at 37:17-38:6; Pl.'s Ex. 52, Wagner Dep. at 44:17-20; Pl.'s Ex. 46, Gershater Dep. at 18:16-18, and that

---

[2] Because the court finds that Khan's retaliation claims survive summary judgment based on the allegations concerning the company's failure to hire him for certain open positions in 2011, the court does not need to address the allegations concerning the company's alleged acceleration of Khan's projected lay-off date or any other adverse action alleged by Khan.

she was senior to the other interviewers involved in the process, see, e.g., Defs.' Statement ¶ 236 (asserting that "Bender was Gershater's boss").

Second, a dispute of material fact exists as to the extent of Bender's knowledge of Khan's protected conduct at the time of the August 2011 interview. The record provides a basis for a jury to find that, at the time of the August 2011 interview, Bender at least knew that Khan had made a complaint concerning (1) Kreschmar's April 2010 comment and (2) the interview process for the January 2011 position. See Defs.' Ex. B, Bender Dep. at 72:22-73:11. Bender, as head of the Canton office, had been present at the April 2010 meeting at which Kreschmar made his discriminatory remarks and took no action after hearing them. Pl.'s Ex. 3, Bender Dep. at 30:1-31:5. After Khan reported Kretschmar's comments to Human Resources, Bender confirmed that Krestchmar had made the comments. Id. at 31:19-20. And Peter McCarron, Claim Director, contacted Bender after learning about the comment to discuss what had occurred with her. Pl.'s Ex. 4, McCarron Dep. at 33:19-37:6.

Additionally, Bender was aware that Khan had questioned the hiring process for the January 2011 position. On June 1, 2011, McDevitt emailed Bender asking her for information concerning the January 2011 position. When Bender inquired as to why McDevitt was asking, McDevitt responded that there was "an ER issue going on where [Khan] is questioning a few things, including getting some feedback about why he didn't get this position." Pl.'s Ex. 9, McDevitt Dep. at 132:1-23.

As to Bender's knowledge of Khan's complaints about McKenna, Defendants contend that Bender was not aware of those complaints. Considering, however, that Bender was McKenna's supervisor during the relevant period, see Pl.'s Ex. 3, Bender Dep. at 26:19-27:1, and that OneBeacon removed Khan from McKenna's supervision in November 2010 in response to

his complaints, see Defs.' Response ¶ 436, a reasonable inference could be drawn that Bender was made aware of these complaints.

Third, a dispute of material fact exists as to the extent of Bender's role in the interview processes and whether she may have influenced the hiring decisions. Defendants assert that Bender tried to defer to the other interviewers as much as possible because she did not want to influence the hiring decision. Defs.' Statement ¶ 172. Khan disputes this fact by highlighting: (1) Lamble's testimony that Bender was actively involved in the interview process, Pl.'s Ex. 53, Lamble Dep. at 14:14-19; (2) Richard Gershater's testimony that Bender gave him feedback on the candidates, Pl.'s Ex. 46, Gershater Dep. at 41:24-42:2; and (3) Lamble's testimony that Bender told her "that there was some sensitivity about [employee relations issues with respect to Khan]" during the August 2011 interview process, Pl.'s Ex. 53, Lamble Dep. at 33:7-14.

Fourth, the record supports an inference that, during the interview processes, Bender may have downplayed her previously positive assessment of Khan's work performance. Defendants admit that before Khan complained of discrimination, "Bender was complimentary of Khan's work and even sent him thank-you notes" and that "Bender was instrumental in rehiring Khan to OneBeacon." Defs.' Statement ¶ 9, 15. Lamble, however, testified in her deposition that during the hiring process Bender merely assessed Khan as an "[a]dequate, fine, satisfactory" employee. Defs.' Ex. K, Lamble Dep. at 20:10-19.

Finally, Khan disputes the legitimacy of the hiring process itself. First, Khan argues that the record supports the inference that there was no standard process for the filling of positions. To support this inference, Khan points to the fact that others had not gone through a hiring process when moving into different positions within OneBeacon, that he himself had been rehired without having to go through an interview process, and that Philip Sibilia, Chief Claims

Executive, believed that Khan could simply be moved into the January 2011 position. See Pl.'s Response ¶ 146.

Standing alone, these assertions may not sufficiently place the legitimacy of OneBeacon's hiring processes for the open 2011 positions into doubt. However, Khan's claim that OneBeacon's hiring processes were contrived to mask its retaliation against him is supported by additional facts. For example, the interviewers—the decisionmakers in the hiring process— were not given any information beyond the candidate's résumés. See Pl.'s Ex. 46, Gershater Dep. at 18:19-11; 32:12-33:6. Gershater, for instance, testified that at no time did Human Resources share with him its analysis of the candidates' work histories or individual strengths and weaknesses, despite the fact that the candidates were internal. Id. Moreover, Sibilia testified that upon learning of the questions asked during the interview, he found the interview process "strange" and was concerned enough to ask someone within the company to look into the process. Khan Ex. 1, Sibilia Dep. at 102:6-104:5. Considering the above, the court finds that Khan has sufficiently disputed the legitimacy of the company's hiring process for the open 2011 positions.

As the foregoing demonstrates, there exists a dispute as to material facts supporting Khan's retaliation claim. The above-referenced disputes, though not meant to be an exhaustive list of each materially disputed fact in this case, are sufficient to preclude the court's issuance of summary judgment.

III.    <u>Conclusion</u>

For the foregoing reasons, Defendant's <u>Motion for Partial Summary Judgment</u> [#91] is

hereby denied.

IT IS SO ORDERED.

Date: March 31, 2015                                    /s/ Indira Talwani
                                                       United States District Judge